**SEALED**

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

NOV - 8 2016

JULIA C. DUDLEY, CLERK
BY: _A. Mayack_
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
### for the
Western District of Virginia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>23227 Conner Lane Bristol, Viriginia 24202 | )<br>)<br>)<br>)<br>)<br>)    Case No. 1:16mj197 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:   See attachment A

located in the _____Western_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:   See attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 USC 846 | Conspiracy to Possess with the Intent to Distribute Methamphetamine. |

The application is based on these facts:   See Attachment C

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Justin Masuhr   ATF S/A
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/8/16

City and state: Abingdon, VA

Pamela Meade Sargent
*Judge's signature*

Pamela Meade Sargent USMJ
*Printed name and title*

# ATTACHMENT A

## DESCRIPTION OF PLACES TO BE SEARCHED

### THE PREMISIES:

The residence is a one story single family residence white in color with concrete lower half. There is a carport located on the left hand side. The front door has a storm door. There is a brown roof and a front porch with stairs on each side. The numbers "23227" are located on the left side of the front porch. See attached photo.

### VEHICLES/CURTILAGE

Any and all vehicles and/or trailers located on the property. Any and all outbuildings on the property.

### LOCATION OF THE PREMISIES:

Residence is located at 23227 Conner Lane Bristol, VA.



**ATTACHMENT B**

**List of items to be searched for and seized at premise**

1. Books, records, receipts, bank statements, and records, money drafts, letters of credit, money order and cashier's checks, the obtaining, secreting, transfer, and concealment of assets in the obtaining, secreting, transfer, concealment and expenditure of money.

2. Electronic equipment, such as mobile telephones, computers, currency counting machines, electronic media storage devices, surveillance camera storage devices, and any information stored in memory or contained in any related hardware and software, and to conduct an off-site search, for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search these items on-site for this evidence.

3. Photographs, in particular, photographs of individuals with firearms and/or controlled substances, and other documents identifying associates and conspirators.

4. Indicia of occupancy, residence, and ownership of the premise, including but not limited to, utility and telephone bills, canceled envelopes, and keys.

5. Books, records, receipts, notes, ledgers, letters, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances.

6. Address and telephone books and papers reflecting names, address and telephone numbers.

7. United States currency in excess of $1,000.00.

8. Narcotics, marijuana and other illegal controlled substances.

9. Paraphernalia for packaging, cutting, weighing and distributing illegal drugs, including but not limited to, scales, baggies, and cutting agents.

10. Firearms, firearm magazines, firearm attachments, ammunition, firearm parts and holsters; documentation of the purchase, storage, possession, disposition, dominion and control of firearms, including paperwork and receipts.

11. Any locked or closed container(s) believed to contain any of the above listed evidence.

Your affiant, Justin T. Masuhr, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Washington Field Division, Bristol Post of Duty, having been duly sworn, deposes and states as follows:

## INTRODUCTION

1.  I am a Special Agent (SA) with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and am empowered by law to conduct investigations and to make arrests for offenses against the United States of America and United States Code. I have been employed by ATF since February 19, 2008. I received training with the Federal Law Enforcement Training Center (FLETC), and ATF National Academy in Brunswick, Georgia. At the ATF National Academy your affiant was trained in various investigative techniques and law, including the preparation of proper criminal complaints and search warrant affidavits. Since becoming a Special Agent with ATF, your affiant has prepared and participated in the execution of numerous federal, state and local search warrants. I obtained my education from St. John's University where I graduated with a degree in Criminal Justice.

2.  I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18 United States Code.

3.  Through instruction and participation in investigations, your affiant has become familiar with the manner and methods by which narcotics traffickers conduct their illegal business and the language and terms that are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, that in conversations narcotics traffickers believe susceptible to interception, they virtually never expressly refer to methamphetamine or other illegal drugs by name; instead to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms. Further, based upon your affiant's knowledge, training, experience and participation in firearm and narcotic trafficking investigations, your affiant knows that: Individuals who deal in illegal controlled substances maintain books, records, receipts, notes, ledgers, bank records, money orders, electronic files/data, computers and papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances. These books, records, receipts, notes, ledgers, bank records, money orders, electronic files, computers, etc., are maintained in locations to which the dealers in illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

4.  Individuals who deal in illegal controlled substances routinely conceal large quantities of currency, financial instruments, precious metals, jewelry, and other items of value,

typically proceeds of illegal controlled substance transactions. Indeed, when drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits. To accomplish this, drug traffickers may utilize domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks, money drafts, letters of credit and safe deposit boxes. All of these items are generally found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

5.      It is common for individuals who deal in the sale of illegal controlled substances, to secrete contraband related to the trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, hair dryers, blenders, pots, dishes and other containers for preparing methamphetamine and other controlled substances for distribution, within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

6.      Individuals who deal in the sale and distribution of controlled substances commonly maintain telephone numbers and address books or papers which reflect names, addresses and/or telephone numbers for their associates. These individuals often utilize cellular telephones, and other means of electronic communication to maintain contact with their associates in their illegal businesses. These electronic devices, telephone records, bills and paper are often found within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

7.      Individuals who deal in illegal controlled substances often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

8.      Persons who traffic in controlled substances maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities, such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

9.      Individuals involved in narcotics trafficking often own, possess and/or use firearms as a means of facilitating their illegal drug activities. Said firearms are used to protect and secure a drug traffickers property and narcotics from law enforcement and from theft by

other criminals. Drug traffickers also possess firearms as a means of enforcing drug transactions, i.e., as a means of ensuring payment for the drugs they are selling. Such weapons are most often secreted within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas. Persons who possess or collect firearms also keep other firearm related equipment, to include ammunition, ammunition magazines, holsters, bullet proof vests, pistol grips, pistol boxes, cleaning kits and paperwork relating to the acquisition and disposition of firearms.

10.   Individuals who are members of active drug organizations stay in regular contact with one another. This contact does not terminate once an individual is incarcerated. Incarcerated members of drug organizations routinely send letters to and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, from financial help to help in engaging in witness intimidation or elimination. In addition, incarcerated members often keep photographs of themselves and other members of their organization in order to obtain respect from other inmates.

11.   The information contained in this affidavit is based on my personal observations, observations of other law enforcement officers, observations of Confidential Informants (CI's) and Cooperating Sources (CS) as related to me, my review of official police and government reports, and consultation with other agents/officer involved in the investigation and is provided for the limited purpose of establishing probable cause. The information is not a complete statement of all the facts related to this case.

12.   This affidavit is submitted in support of a request that a search warrant(s) be issued for the residence of Kaitlynn KAYIAN and Bradley CHAPMAN 23227 Conner Lane Bristol, Virginia for violations of Title 21, United States Code, Section 846, Conspiracy to distribute methamphetamine.

13.   Beginning in 2014, law enforcement in Southwest Virginia began to obtain information regarding the manufacturing and distribution of quantities of crystal methamphetamine in the communities of Abingdon located in Washington County, Virginia, and Russell County, Virginia. Through arrests, search warrants, interviews, and the cultivation of confidential informants, law enforcement was able to identify a network of individuals involved in the possession and distribution of crystal methamphetamine, firearms trafficking and violent crime in Southwest Virginia, North East Tennessee, and Nevada.

14.   From September 2014 until the present, federal, state, and local law enforcement have conducted interviews, executed search warrants, conducted surveillance, analyzed phone records and conducted controlled purchases of methamphetamine and firearms from members of the conspiracy. In April 2014, approximately 30 defendants were arrested relating to this investigation. In December 2014, approximately 24 defendants were arrested. In December 2015, approximately 16 defendants were arrested. From the arrests, guilty pleas, search warrants and interviews associated with these events physical

evidence and testimony was gained that show the ongoing and furtherance of a large scale conspiracy to distribute methamphetamines, use of firearms in furtherance of narcotics trafficking and laundering of the proceeds of narcotics trafficking.

15.     This investigation has identified several drug trafficking organizations (DTO) operating in SWVA. Though the DTO operate independently members of the DTO associate and do business with one another. The DTO identified in this indictment is the STONE DTO. This DTO is operating in the Western District of Virginia, Eastern, Eastern District of Tennessee and District of Nevada. Beginning in 2014 law enforcement in Southwest Virginia began to obtain information regarding the manufacturing and distribution of quantities of crystal methamphetamine in the communities of Abingdon located in Washington County, Virginia and Lebanon in Russell County, Virginia. Through arrests, search warrants, interviews, and the cultivation of confidential informants, law enforcement was able to identify a network of individuals involved in the possession and distribution of crystal methamphetamine, firearms trafficking and violent crime in Southwest Virginia, Eastern Tennessee and Nevada.


## STATEMENT OF PROBABLE CAUSE

### 23227 Conner Lane Bristol, Virginia

According to the records of FedEx Services, between the dates of September 3, 2013 and December 11, 2013, Brandon STONE received approximately 21packages at the ABC Store located at 545 W. Main St., Abingdon, VA. All of these packages were sent from two individuals in Las Vegas, NV.

Between the dates of October 11, 2013 and May 20, 2014, Richard KAYIAN received eleven (11) FedEx packages at 265 Melrose St., Abingdon, VA, the residence of his daughter, Kaitlynn KAYIAN. In 2014, three additional packages were shipped to Kaitlynn KAYIAN at this same address. In 2015 there was at least one package sent to 23227 Conner Lane Bristol, Virginia. These packages were all sent from individuals in Las Vegas, NV.

It is believed by your affiant that these packages contained illegal narcotics, which were paid for in part via the Western Union Money Transfers listed above.

According to the records of Verizon Wireless, telephone number (276) 274-3949 has been resold to TracFone Wireless. According to the records of TracFone Wireless, the subscriber to telephone number (276) 274-3949 is Kaitlynn KAYIAN at 803c Edgemont, Abingdon, VA.

On July 18, 2014, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of cellular telephones utilized by Steven SALYER and Brandon STONE. In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in those accounts from July 3, 2014 to July 18, 2014. The following is an excerpt from the search warrant results:

**July 15, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 274-5167 (Brandon STONE), "*Okay. Uhm I have a question?*"

STONE to K. KAYIAN, "*Yeah what's up*"

K. KAYIAN to STONE, "*How much can you sell a buzz bar for?*"

STONE to K. KAYIAN, "*IDK*"

K. KAYIAN to STONE, "*Hmmm.*"

STONE to K. KAYIAN, "*Never liked them.*"

K. KAYIAN to STONE, "*Well I got a whole script of them*"

STONE to K. KAYIAN, "*Hell*"

K. KAYIAN to STONE, "*My doctor thinks I have issues lol*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN inquired of Brandon STONE how much money she could make by selling a prescription.

On August 1, 2014, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of cellular telephones utilized by Steven SALYER, Brandon STONE and John FARMER. In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in those accounts from July 18, 2014 to August 1, 2014. The following is an excerpt from the search warrant results:

**July 18, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 274-3085 (John FARMER), "*Hey*"

FARMER to K. KAYIAN, "*Yea*"

K. KAYIAN to FARMER, "*Dad said I was suppose to get some money*"

FARMER to K. KAYIAN, "*Hell how much*"

K. KAYIAN to FARMER, "*Uhmm 100.00 I guess*"

K. KAYIAN to FARMER, "*Is that cool?*"

FARMER to K. KAYIAN, "*I'll let you know soon as I can meet*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN advised John FARMER that Richard KAYIAN ("*Dad*") approved her picking up $100.00 in drug proceeds from Farmer.

**July 25, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 274-3085 (John Farmer), "*Hey I just need to pick up some money before you get to busy!*"

FARMER to K. KAYIAN, "*Do you think you could meet me before 7:15 am*"

K. KAYIAN to FARMER, "*Yeah where you at lets meet now*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN utilized the text messaging service of K. KAYIAN to contact John Farmer. I believe that KAYIAN arranged to pick up drug proceeds from Farmer.

**August 1, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 274-3085 (John FARMER), "*Hey have you talked to my Dad?*"

K. KAYIAN to FARMER, "*Cause I have to be at the post office by 5*"

FARMER to K. KAYIAN, "*I am leaving my house in just a min so if ya wanna meet on the street behind the bank that be cool*"

K. KAYIAN to FARMER, "*Yeah that's fine*"

FARMER to K. KAYIAN, "*On my way*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN arranged to pick up drug proceeds from John FARMER at the direction of Richard KAYIAN ("*Dad*"). I believe that K. KAYIAN was going to send the money to her father via USPS by 5:00.

On October 29, 2014, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of telephone numbers (276) 698-1195 (Brandon STONE), (276) 274-5278 (John FARMER) and (276) 274-3858 (John FARMER). In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in those accounts from October 12 to October 29, 2014. The following is an excerpt from the search warrant results:

**October 14 – 17, 2014**

(702) 475-0507 (Richard KAYIAN) to (276) 698-1195 (Brandon STONE), "*Are you awake*"

R. KAYIAN to (276) 274-3858 (John FARMER), "*Are you awake*"

KAYIAN to FARMER, "*Are you awake*"

KAYIAN to STONE, "*What's going on*"

(276) 274-3949 (Kaitlynn KAYIAN) to STONE, "*Hey*"

STONE to K. KAYIAN, "*Sup*"

K. KAYIAN to STONE, "*Not much trying to get tgis cranky child put down lol*"

STONE to K. KAYIAN, "*Mommy problems*"

K. KAYIAN to STONE, "*Yes bad lol*"

Richard KAYIAN to STONE, "*What's going on*"

K. KAYIAN to STONE, "*I was just going to see if I could pick up some money*"

STONE to K. KAYIAN, "*Come on by here please if u don't care*"

K. KAYIAN to STONE, "*I'll jist hollee at ypu qhen I get back*"

STONE to K. KAYIAN, "*Hell just meet me a Wendys*"

K. KAYIAN to STONE, "*Okay*"

STONE to Richard KAYIAN, "*Monday or Saturday*"

Richard KAYIAN to STONE, "*Monday*"

STONE to Richard KAYIAN, "*Lol ok*"

Based on my training and experience, and my knowledge of this investigation, I believe that Richard KAYIAN made attempts to contact Brandon STONE and John FARMER. I believe that Kaitlynn KAYIAN contacted STONE to collect drug proceeds for her father (Richard KAYIAN). I believe that Richard KAYIAN notified STONE that the next drug delivery would occur on Monday.

**October 19, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), "*Hey*"

STONE to K. KAYIAN, "*What's up*"

K. KAYIAN to STONE, "*Nothing. I gotta meet yp with you and pick up money for my boobie pump lol.*"

STONE to K. KAYIAN, "*How much u need*"

K. KAYIAN to STONE, "*150.00*"

STONE to K. KAYIAN, "*When u need it*"

K. KAYIAN to STONE, "*Here soon I have to meet up with her in the next hour or so*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN requested to collect drug proceeds from STONE so that she could use it for a personal purchase.

**October 20, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), "*Heyy*"

K. KAYIAN to STONE, "*Call me please*"

K. KAYIAN to STONE, "*Hey I need 220.00 I already talked to Dad*"

STONE to K. KAYIAN, "*Ok*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN told Brandon STONE that she needed to pick up $220.00 in drug proceeds that were owed to her father (Richard KAYIAN) and he had approved it.

**October 22, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), "*Hey nigger.*"

STONE to K. KAYIAN, "*What's up*"

K. KAYIAN to STONE, "*You still wanting to get clothes…I'll drive*"

STONE to K. KAYIAN, "*Not right now got to collect money*"

K. KAYIAN to STONE, "*Lol I didn't mean right now*"

K. KAYIAN to STONE, "*Can you get perks?*"

STONE to K. KAYIAN, "*No I'm looking*"

K. KAYIAN to STONE, "*I got one the other day and did a half of it and was on my ass ahahah*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN asked STONE if he wanted to go shopping. I believe that STONE told KAYIAN that he was busy collecting drug proceeds that were owed to Richard Kayian. I believe that Kaitlynn KAYIAN asked STONE for Percocet ("*perks*").

**October 28, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), "*Hey I need to get some mony*"

STONE to K. KAYIAN, "*Get a job*"

K. KAYIAN to STONE, "*But seriously*"

STONE to K. KAYIAN, "*Ok when u need money*"

K. KAYIAN to STONE, "*Asap*"

STONE to K. KAYIAN, "*I'm at Wesley*"

K. KAYIAN to STONE, "*Fleenor?*"

STONE to K. KAYIAN, "*Yeah*"

K. KAYIAN to STONE, "*Oh omw*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN told Brandon STONE that she needed to collect some money (which were the proceeds from the sale of methamphetamine from Richard KAYIAN). I believe that STONE and K. KAYIAN agreed to meet at the residence of Wesley FLEENOR.

**October 29, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), "*Can you do me a favor…*"

STONE to K. KAYIAN, "*Maybe*"

K. KAYIAN to STONE, "*Don't let me get anymore tabs I have a feeling there is going to be a big custody battle in the near future and I'm not fucking up and getting my kid taken away*"

STONE to K. KAYIAN, "*Ok?? I'm out anyway.*"

K. KAYIAN to STONE, "*I mean like ever again in my life.*"

STONE to K. KAYIAN, "*Ok sure.*"

K. KAYIAN to STONE, "*Thanks.*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN asked Brandon STONE not to ever provide her with Lortab ("*tabs*") again.

On November 14, 2014, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of telephone number (276) 698-1195 (Brandon STONE). In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in that account from October 30 to November 14, 2014. The following is an excerpt from the search warrant results:

**November 1, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), "*Heey*"

STONE to K. KAYIAN, "*Hey*"

K. KAYIAN to STONE, "*What are you doing*"

STONE to K. KAYIAN, "*Sending ur dad money*"

K. KAYIAN to STONE, "*Did he say anything about giving me money before I left?*"

STONE to K. KAYIAN, "*Nope how much u need*"

K. KAYIAN to STONE, "*Idk he didn't tell me and he won't answer the phone*"

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN inquired of Brandon STONE if Richard KAYIAN had directed him to provide her with money (drug proceeds).

According to records of Western Union on November 1, 2014, Brandon STONE transferred $400.00 to Richard KAYIAN in Las Vegas, NV. (Money transfer # 6839332721).

**November 6, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), *"Hey can you drop the rent off to Brad before 2?"*

STONE to K. KAYIAN, *"Yeah"*

**November 11, 2014**

K. KAYIAN to STONE, *"Can you give Brad 100.00 to put in my account before 2:30"*

STONE to K. KAYIAN, *"Yeah"*

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN directed Brandon STONE to provide her with drug proceeds.

On December 1, 2014, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of telephone number (276) 698-1195 (Brandon STONE). In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in that account from November 15, 2014 to December 1, 2014. The following is an excerpt from the search warrant results:

**November 19, 2014**

(276) 274-3949 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), *"I'm outside can I give you that money and pick that up?"*

STONE to K. KAYIAN, *"Yeah"*

**November 20, 2014**

K. KAYIAN to STONE, *"Let me know if u need that tonight"*

STONE to K. KAYIAN, *"Yeah I do"*

K. KAYIAN to STONE, *"On his way"*

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN paid drug proceeds to Brandon STONE and picked up additional drugs.

According to the records of TracFone Wireless, the subscriber to telephone number (276) 525-2874 was Kaitlynn KAYIAN at 265 Melrose St., Abingdon, VA.

On February 18, 2015, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of telephone numbers (276) 698-1195 (Brandon STONE) and (276) 451-5729 (Brandon STONE). In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in

those accounts from February 2, 2015 to February 18, 2015. The following is an excerpt from the search warrant results:

**February 2, 2015**

(276) 525-2874 (Kaitlynn KAYIAN) to (276) 698-1195 (Brandon STONE), *"I was just wondering if you knew any go"*

STONE to K. KAYIAN, *"Na I'm looking"*

K. KAYIAN to STONE, *"Okay. Let me know if you get ahold of any. I'm supposed to link up with some crys from Cali tonight if youd want some"*

STONE to K. KAYIAN, *"Ok cool"*

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN inquired of Brandon STONE if he had any methamphetamine (aka *"go"*). I believe that K. KAYIAN advised STONE that she was going to get some crystal methamphetamine from California (aka *"crys from Cali"*) and offered some to him.

On February 6, 2015, CS-3 was interviewed again in Abingdon, VA. CS-3 stated that he/she was friends with Kaitlynn KAYIAN. CS-3 stated that he/she was present when Kaitlynn KAYIAN asked for money from Brandon STONE, telling STONE that her dad had forgotten to put money in her account and told her to get the money from STONE. CS-3 stated that he/she was familiar with Kaitlynn KAYIAN's dad, Richard KAYIAN, and was aware that he lived in Las Vegas, NV. CS-3 stated that he/she was under the impression that Richard KAYIAN was STONE and John FARMER's source of supply for methamphetamine and pills, to whom they referred as *"Old Man"* and *"Pops"*.

On March 10, 2015, CS-6 was interviewed in Abingdon, VA. CS-6 stated that John FARMER and his partner "Stoney" received five (5) ounces of crystal methamphetamine and 300 dosage units of Roxicet weekly. CS-6 stated that FARMER's source of supply for methamphetamine and pills was "Pops" from Las Vegas, NV. CS-6 stated that "Pops" had a son and daughter who lived in Abingdon, VA. CS-6 stated that Stevie SALYER dated the daughter and sold methamphetamine for "Pops" and FARMER. CS-6 stated that the daughter of "Pops" was addicted to Roxicet.

According to the records of Verizon Wireless, telephone number (276) 608-6719 was subscribed to by Kaitlynn KAYIAN at P.O. Box 612, Glade Spring, VA.

On April 2, 2015, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of telephone numbers (276) 698-1195 (Brandon STONE) and (276) 451-5729 (Brandon STONE). In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in those accounts from March 19, 2015 to April 2, 2015. The following is an excerpt from the search warrant results:

**April 1, 2015**

(276) 608-6719 (Kaitlynn KAYIAN) to (276) 451-5729 (Brandon STONE), *"Brad wants to know if you have and blue things to buy"*

K. KAYIAN to STONE, *"I'm hiding those 10 lol"*

STONE to K. KAYIAN, *"No I don't"*

K. KAYIAN to STONE, *"Okay lol"*

Based on my training and experience, and my knowledge of this investigation, I believe that Kaitlynn KAYIAN inquired of Brandon STONE if he had any Roxicet (oxycodone, aka *"blue things"*) for Bradley CHAPMAN to purchase. I believe that K. KAYIAN advised STONE that she was hiding ten (10) pills so that CHAPMAN could not get to them.

On April 16, 2015, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of telephone numbers (276) 698-1195 and (276) 451-5729 (Brandon STONE). In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in those accounts from April 2, 2015 to April 16, 2015. The following is an excerpt from the search warrant results:

**April 8, 2015**

(276) 608-6719 (Kaitlynn KAYIAN) to (276) 451-5729 (Brandon STONE), *"There is 25 missing my dad said to take them out but do not tell Brad"*

STONE to KAYIAN, *"Yeah I know that did he say anything about keeping any more"*

KAYIAN to STONE, *"No. Not to me. But then again I haven't talked to him"*

STONE to KAYIAN, *"Call and see"*

KAYIAN to STONE, *"I'm in the shower"*

KAYIAN to STONE, *"Why did you tell Brad. Now he's gonna do all of them"*

Based on my training and experience, and knowledge of this investigation, I believe that Kaitlynn KAYIAN told Brandon STONE that her dad (Richard KAYIAN) told her she could keep twenty-five (25) Roxicet (oxycodone) pills from the latest shipment of pills received.

On May 15, 2015, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of telephone numbers (276) 698-1195 (Brandon STONE) and (276) 451-5729 (Brandon STONE). In response to the execution of this

search warrant on Verizon Wireless, agents received text messages stored in those accounts from April 30, 2015 to May 15, 2015. The following is an excerpt from the search warrant results:

**May 1, 2015**

(276) 608-6719 (Kaitlynn KAYIAN) to (276) 451-5729 (Brandon STONE), "*Do you know if anything is coming in tomorrow?*"

STONE to KAYIAN, "*Lol let u know in a few*"

KAYIAN to STONE, "*Okay*"

STONE to KAYIAN, "*Yeah*"

KAYIAN to STONE, "*He said someth k ng to me today. But I never heard back from him.*"

Based on my training and experience, and knowledge of this investigation, I believe that Kaitlynn KAYIAN inquired of Brandon STONE if Richard KAYIAN was sending a package of drugs to STONE.

On May 28, 2015, a search warrant was applied for and obtained in the Western District of Virginia for text message content stored in the accounts of telephone numbers (276) 698-1195 (Brandon STONE) and (276) 623-3634 (Brandon STONE). In response to the execution of this search warrant on Verizon Wireless, agents received text messages stored in those accounts from May 14, 2015 to May 28, 2015. The following is an excerpt from the search warrant results:

**May 27, 2015**

(276) 608-6719 (Kaitlynn KAYIAN) to (276) 623-3634 (Brandon STONE), "*I need that account number?*"

STONE to KAYIAN, "*190-087-9865*"

STONE to KAYIAN, "*Are u going to make it*"

KAYIAN to STONE, "*Yeah I'm getting ready to leave*"

STONE to KAYIAN, *"Ok"*

Based on my training and experience, and knowledge of this investigation, I believe that Kaitlynn KAYIAN requested a bank account number from Brandon STONE so that she could deposit drug proceeds for STONE into Richard KAYIAN's account.

According to the records of Wells Fargo Bank, account number 1900879865 was in the name of Richard H. KAYIAN at 3900 E. Sunset Rd., Apt. 1108, Las Vegas, NV. The records show that on May 27, 2015, $2,300.00 was deposited to Richard KAYIAN's account at the Wells Fargo branch in Abingdon, VA.

On July 9, 2015, CS-10 was interviewed in Bristol, VA. CS-10 stated that Brandon LNU (last name unknown), aka "Stoney", was an "ice" (crystal methamphetamine) distributor in Abingdon, VA. CS-10 stated that "Stoney" was supplied "ice" and Roxicet by Kaitlynn KAYIAN's father in Las Vegas, NV. CS-10 stated that KAYIAN's father had been sending Roxicet to "Stoney" for at least four (4) years.

CS-10 stated that he/she had purchased Roxicet pills from Kaitlynn KAYIAN several years ago.

On October 19, 2015, at approximately 2:30 p.m., surveillance was conducted at 23227 Conner Ln., Bristol, VA, the residence of Kaitlynn KAYIAN and Bradley CHAPMAN. Observed in the driveway of the residence was a silver Dodge Charger, VA license VHK 8666. According to the records of the Virginia Department of Motor Vehicles obtained, VA license VHK 8666 returned to a 2015 Dodge 4 door, registered to EAN Holdings LLC (Enterprise Rent a Car).

According to the records of Enterprise, the aforementioned Dodge Charger was rented on September 30, 2015 by Richard KAYIAN. According to the rental contract, KAYIAN resided at 1350 North Town Center Dr., Las Vegas, NV and had a telephone number of (702) 475-0507. The secondary driver listed on the rental contract was Brandon STONE.

On October 22, 2015, at approximately 2:30 p.m., surveillance was conducted at 155 E. Glade St., Glade Spring, VA, the residence of Alex KAYIAN. Observed in the driveway of the residence was the same Dodge Charger seen at Kaitlynn KAYIAN's residence on October 19, 2015. Agents observed Richard KAYIAN on the front porch of the residence using a cellular telephone.

On October 22, 2015, CS-11 was interviewed in Abingdon, VA. CS-11 stated that he/she was friends with Alex KAYIAN in 2013 and 2014. CS-11 stated that KAYIAN bragged that he and his sister, Kaitlynn KAYIAN, were involved in the distribution of crystal methamphetamine and pills provided by their father, Richard KAYIAN aka "Pops", in Las Vegas, NV.

During the course of this investigation agents involved became aware that Brad Chapman and Kaitlynn KAYIAN (CHAPMAN) moved to Conner Lane in Bristol, VA. A deed search for 23227 Conner Lane Bristol, Virginia shows Bradley CHAPMAN and Karla CHAPMAN (Brad's mother) as owners with Kaitlynn Chapman listed as Brad CHAPMAN'S wife and occupant.

**September 29, 2015**

(276-608-6719) (Kaitlynn KAYIAN) to (276-623-3634) (Brandon STONE*), "Would you help me and Brad move tomorrow?"*

Based on my training and experience, and knowledge of this investigation, I believe that Kaitlynn KAYIAN requested help to move into the new residence 23227 Conner Lane Bristol, Virginia from Brandon STONE.

**October 1, 2015**

(276-608-6719) (Kaitlynn KAYIAN) to (276-780-7652) (Lamar SKIPPER), *"There aint nothing coming in. and duran just needed somewhere to crash for a few days. and who goes around what is me and my dads business."*

Based on my training and experience, and knowledge of this investigation, I believe that Kaitlynn KAYIAN is telling Lamar SKIPPER that FNU Duran was staying at her place and then refers to her and her dads (Richard KAYIAN) business of narcotics trafficking.

**December 18, 2015**

(702-475-0507) (Richard KAYIAN) to (702-468-4437) (Stephen CINO), "going to my daughters in Bristol on Conner Lane."

Based on my training and experience, and knowledge of this investigation, I believe that Richard KAYIAN is traveling to 23227 Conner Lane Bristol, Virginia to see his daughter Kaitlynn KAYIAN.

**December 19, 2015**

(276-608-6719) (Katilynn KAYIAN) to (702-468-4437) (Stephen CINO), *"I don't know. My dad is sleeping"*

KAYIAN to CINO, *"yeah. But my brother had my son last night so over slept all day. But yeah it got here at like 9 this morning."*

Based on my training and experience, and knowledge of this investigation, I believe Kaitlynn KAYIAN is telling Stephen CINO that her father is sleeping but that had a package from CINO had arrived at 9am.

On February 19, 2016, Cody TRIVETT was interviewed in Bristol, VA. TRIVETT stated that he received four (4) "8 balls" (1/2 ounce total) of crystal methamphetamine every other day from Brandon STONE since the beginning of January, 2016. TRIVETT stated that he used some of it and sold the rest to be able to pay STONE back $800.00 per ½ ounce.

TRIVETT stated that Alex KAYIAN had been driving STONE around delivering methamphetamine in a silver Dodge Charger. TRIVETT stated that KAYIAN drove STONE to pick up the methamphetamine when KAYIAN's father sent it. TRIVETT stated that STONE received tracking numbers corresponding to the packages of methamphetamine being sent.

**February 24, 2016**

(276-285-4645) (Brandon STONE) to (276-477-0891) (Bradley CHAPMAN), *"how many u need bro."*

CHAPMAN to STONE, *"you want me to get rid of some for you or nah cause bird and s couple people have been asking me"*

Based on my training and experience, and knowledge of this investigation, I believe that Brandon STONE is asking how many pills Brad CHAPMAN wants. CHAPMAN is then saying people are asking for pills and the if STONE wants he can sell them for STONE.

**March 26, 2016**

(276-608-6719) (Kaitlynn KAYIAN) to (276-469-1866) (Brandon STONE), *"can I pick up some money and 3 of those."*

STONE to KAYIAN, *"out of those and yeah I can do money"*

Based on my training and experience, and knowledge of this investigation, I believe that Kaitlynn KAYAIN is asking Brandon STONE for money and pills. STONE tells KAYIAN he is out of pills but has money for her. During the course of the investigation we have learned that Kaitlynn KAYIAN will get proceeds from drug sales from STONE and that in the past Richard KAYIAN as directed STONE to give Kaitlynn KAYIAN proceeds from drug sales.

**April 10, 2016**

(276-608-6719) (Kaitlynn KAYIAN) to (276-469-1866) (Brandon STONE), *"did you ever find 5 of those. Because Brad is leaving at 7 in morning."*

STONE to KAYIAN, *"Im working on that."*

KAYIAN to STONE, *"well he needs them tonight. Because he wont have time to pick them up in the morning."*

STONE to KAYIAN, *"I will try trust me I am trying."*

Based on my training and experience, and knowledge of this investigation, I believe that Kaitlynn KAYIAN is asking STONE for 5 pills for Brad CHAPMAN. And is stating that he is leaving in the morning. STONE replies he is working getting more.

CS-11 stated that Alex KAYIAN and Kaitlynn KAYIAN received FedEx packages weekly from their father. CS-11 stated that each package usually contained up to 300 Roxicet pills (oxycodone) and a gallon size bag of crystal methamphetamine. CS-11 stated that he/she observed at least three (3) FedEx deliveries to an address on Melrose Ave. in Abingdon, VA where Alex and Kaitlynn KAYIAN resided at the time. CS-11 stated that he/she received some of the pills but did not use methamphetamine.

CS-11 stated that once the FedEx package arrived and was accepted by either Alex or Kaitlynn KAYIAN, it was taken into the kitchen of the residence where it was weighed out and

packaged for distribution. CS-11 stated that Kaitlynn KAYIAN was usually the one to do this, as Alex KAYIAN had a pill addiction and was not as trusted by their father. Others who participated in the packaging of the drugs included Bradley CHAPMAN, Kaitlynn KAYIAN's boyfriend at the time.

CS-11 stated that once the drugs had been packaged for distribution, Kaitlynn KAYIAN made telephone calls to distributors who would come to the house to pick up. CS-11 stated that these distributors included John FARMER, Brandon STONE, Steve SALYER and Jeremy Bartley. CS-11 stated that FARMER originally picked up the most drugs for distribution, but somehow messed up the money and was replaced by STONE.

CS-11 stated that he/she had purchased pills from Brandon STONE, John FARMER, Kaitlynn KAYIAN and Bradley CHAPMAN. CS-11 stated that he/she usually paid $35.00 for a 30 mg Roxicet, and $20.00 for a 15 mg Roxicet. CS-11 stated that she had received many pills from Alex KAYIAN but did not pay for them.

CS-11 stated that at the time, neither Kaitlynn KAYIAN nor Alex KAYIAN had jobs. CS-11 stated that Brandon STONE or John FARMER brought money to them as needed, at the direction of Richard KAYIAN.

According to the records of NCIC, Kaitlynn KAYIAN and Bradley Chapman has no prior criminal history.

## TECHNICAL TERMS

1. Based on my training and experience, I believe the following technical terms are used to convey the following meanings:

    a. IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    b. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

    c. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, floppy disks, flash memory, CD-ROMs, and several other types of magnetic or optical media not listed here.

    d. Cellular telephone: A cellular telephone (or mobile telephone, cellular device, or wireless telephone) is a handheld wireless device used primarily for voice

communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

e.  Digital camera: A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

f.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

## COMPUTERS, CELLULAR DEVICES, STORAGE MEDIUMS AND FORENSIC ANALYSIS

1.  As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive, whether internal or external, cellular device, or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

2. I submit that if a computer, cellular device, or storage medium is found on the premises, there is probable cause to believe those records will be stored in that computer, cellular devices, or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files and other electronic information or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or cellular device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

3. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

4. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well:

    a. Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is, as described further in Attachment B, called for by this warrant. Data on the storage medium not currently associated with any file can

provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer, cellular device, or storage medium can also indicate who has used or controlled the computer, cellular device, or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer, cellular device, or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer or cellular device works can, after examining this forensic evidence in its proper context, draw conclusions about how computers or cellular devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer or cellular device is evidence may depend on other information stored on the computer or cellular device, and the application of knowledge about how a computer or cellular device behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer or cellular device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner. Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent. To investigate the crimes described in this warrant,

it might be necessary to investigate whether any such malicious software is present, and, if so, whether the presence of that malicious software might explain the presence of other things found on the storage medium. I mention the possible existence of malicious software as a theoretical possibility, only; I will not know, until a forensic analysis is conducted, whether malicious software is present in this case.

5. Searching storage media for the evidence described in the attachments may require a range of data analysis techniques. It is possible that the storage media located on the premises will contain files and information that are not called for by the warrant. In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, it is possible, though rare, for a storage medium to be organized in a way where the location of all things called for by the warrant are immediately apparent. In most cases, however, such techniques may not yield the evidence described in the warrant. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. As explained above, because the warrant calls for records of how a computer or cellular device has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

6. Based upon my knowledge, training and experience, it is known to this agent that records and media contained on cellular devices, computers and storage media, may be printed onto paper or other means of permanent "hard-copy."

7. Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

   a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer or cellular device has been used, what it has been used for, and who

has used it requires considerable time, and taking that much time on premises could be unreasonable.

b. The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

8.  In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals, if any are present, that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the computer hardware, storage media, and associated peripherals, for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware, storage media, and associated peripherals on-site for this evidence.

9.  Because, on information and belief, several people share the PREMISES as a residence, it is possible that the PREMISES will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If agents conducting the search nonetheless determine that it is possible that the things described in this warrant could be found on any of those computers or storage media, this application seeks permission to search and if necessary to seize those computers or storage media as well. It may be impossible to determine, on scene, which computers or storage media contain the things described in this warrant.

## CONCLUSION

1.  Based on your affiant's knowledge, training, experience, and participation in this investigation involving the conspiracy to distribute methamphetamine your affiant knows that:

- Individuals involved in conspiracy to distribute methamphetamine often maintain documents, letters and records relating to their illegal activities for long periods of time. This documentary evidence is usually secreted within their residences and the surrounding outbuildings; their vehicles; the residences of family members, friends and associates; the places in which they conduct their business; or in storage areas.

- Your affiant has examined land, tax and utility records for the location to be searched, and has conducted surveillance of the location to be searched. My examination has determined that the property is the residence of and in the dominion and control of Kaitlynn CHAPMAN (KAYIAN) and Bradley CHAPMAN.

2.  Based on the facts set forth in this affidavit it is believed that probable cause exists that records, fruits, instrumentalities, and evidence of a crime pertaining to the alleged offense of conspiracy to distribute methamphetamine will be located at the residence of Kaitlynn KAYIAN and Bradley CHAPMAN, 23227 Conner Lane Abingdon, Virginia which is further described in attachment A, which is incorporated and made a part of this Affidavit.

## REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief. Executed on _____11/8_____, 2016.

_____
Justin T. Masuhr, Special Agent, (ATF)

Subscribed and sworn to before me, this the ___8th___ day of __November__, 2016.

Pamela Meade Sargent
United States Magistrate Judge